**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

THE DANNON COMPANY, LLC,

                    Plaintiff,

        -against-

FEDERICO MUYSHONDT,

                    Defendant.

Civil Action No. _____

**<u>COMPLAINT</u>**

**JURY TRIAL DEMANDED**

Plaintiff, The Dannon Company, LLC ("Dannon"), alleges for its Complaint against Defendant Federico Muyshondt ("Muyshondt") the following:

<u>**NATURE OF THE ACTION**</u>

1.     This action arises out of Muyshondt's misappropriation of his former employer Dannon's highly sensitive confidential information and trade secrets, in violation of federal law, his contractual obligations, and his duties of loyalty and fidelity as a Dannon employee, in an apparent attempt to provide Dannon's confidential information and trade secrets to its direct competitor and his new employer, Chobani, LLC ("Chobani").

2.     In the months leadings up to his resignation on January 16, 2018 from his high-level position as Senior Vice President in Sales at Dannon, Muyshondt engaged in an extensive effort to download and obtain Dannon's trade secrets and confidential information, as well as salaries for his co-workers and information about the non-compete and confidentiality agreements that bound some of them and—four days before he resigned—a contact list for every Dannon employee connected to the two sales teams that Muyshondt supervised. The only logical explanation for why Muyshondt would have obtained the latter information is that he wanted to assist his new employer in luring away Dannon's other valued members of its sales teams.

3.      Muyshondt also removed the "SIM" card[1] from his company-issued phone—which may have contained, among other things, contact information for some of his co-workers and Dannon's customers that he has communicated with from that phone—without authorization.  He then inserted a new SIM card into the phone and, upon his resignation, returned the phone to Dannon without telling Dannon what he had done.  Muyshondt has never returned the SIM card to Dannon.

4.      Dannon's forensic review of the matter also reveals that Muyshondt forwarded extremely sensitive internal strategy documents to his private email account in the months preceding his departure, and that he downloaded thousands of electronic files containing trade secrets and confidential information onto USB devices, all of which was out of the ordinary from his prior conduct.  It appears that these efforts were made to gather information for Muyshondt to take with him upon his departure from Dannon.

5.      Accordingly, and given both the magnitude of the apparent misconduct here and the fact that Muyshondt will be commencing employment with a key competitor of Dannon, this action seeks appropriate injunctive and monetary relief, including preliminary injunctive relief designed to protect Dannon's information and to determine the full extent of the misconduct.

## PARTIES

6.      Plaintiff Dannon is a limited liability company duly organized and existing under the laws of the State of Delaware, with its principal place of business in White Plains, New York.

7.      Defendant Muyshondt is a citizen of the State of New York and resides in Mount Kisco, New York.

---

[1] The "Subscriber Identity Module," an integrated circuit chip inserted into a mobile phone to securely store information about the phone's user.  As noted below, that information may include phone book contact information.

## JURISDICTION AND VENUE

8.    Upon information and belief, Muyshondt has committed and is committing wrongful acts including misappropriation of confidential information and trade secrets, and/or breaches of contracts, as hereinafter alleged, in this District.

9.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, because Dannon has asserted a claim for misappropriation of trade secrets under the Defend Trade Secrets Act of 2016 against Muyshondt.  This Court has supplemental or pendent jurisdiction over Dannon's remaining claims pursuant to 28 U.S.C. § 1367 because such claims are so related to Dannon's federal misappropriation of trade secrets claim that they form part of the same case or controversy under Article III of the United States Constitution.

10.    Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and (c) because a substantial part of the events or acts giving rise to the claim occurred in this Judicial District and because Muyshondt resides in this District.

## STATEMENT OF FACTS

11.    Dannon produces and sells fresh and frozen dairy products. The company's products include, without limitation, dairy snacks, yogurts, and frozen yogurt.

12.    In 2010, Muyshondt became an employee of Dannon as a manager within its sales department.  He subsequently was promoted and in 2017 he became a Senior Vice President, in charge of Dannon's sales teams for the East Division and Kroger.  In his positions, Muyshondt had access to Dannon trade secrets and confidential information, including concerning research and development, strategic growth plans, and customer pricing information.

13.    The East Division sales team covers the Eastern Seaboard, from Florida up through the Northeast, including New York and Massachusetts.

14.     The Kroger sales team covers sales activities relating a large Dannon customer, a major U.S. supermarket headquartered in Ohio that operates stores in the Midwest and in numerous other states.

## CONFIDENTIAL INFORMATION AND TRADE SECRETS

15.     Dannon possesses valuable trade secrets and confidential information, whose economic value in part derives from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information, such as Dannon's competitors in the yogurt business.

16.     These trade secrets include information about Dannon's long term and short term business strategies, future product plans and launches, innovations, sales strategies, market trends, customer lists, customer and other third party contacts, and evaluations of its strengths and weaknesses and the strengths and weaknesses of its competitors.

17.     Dannon takes numerous measures to protect the secrecy of its trade secrets and other proprietary and confidentiality information.

18.     Among other things, Dannon requires each new employee to sign a confidentiality agreement as a condition of employment.

19.     Thus, in addition to the employment offer letter that Dannon sent Muyshondt in 2010, he was provided with a second document that informed him of his confidentiality obligations and required him to sign a confidentiality agreement.  The letter stated,

> As you know, Dannon is engaged in a highly competitive business involving the development manufacture and sale of yogurt and other food products. Accordingly, Dannon develops and uses various valuable trade secrets as well as other technical and non-technical information, which it protects either by patents or by keeping secret information confidential. Since you are to be employed by Dannon in a capacity in which you may receive, have access to, or work with confidential information, which may or may not be patentable, you are required as a condition of your employment, to sign the attached Confidentiality Agreement and

Agreement relating to the Assignment of Inventions (the "Agreement"). By signing this Agreement, you agree to maintain the confidentiality of Dannon's secrets.

20. Muyshondt duly signed a Confidentiality Agreement and Agreement relating to the Assignment of Inventions (the "Agreement"), which provides in pertinent part:

### 1. NON-DISCLOSURE OF TRADE SECRETS AND CONFIDENTIAL INFORMATION AND RETURN OF DANNON PROPERTY

Except as required by Employee's duties at Dannon, Employee agrees not to disclose or utilize, either during the course of employment or thereafter, trade secrets or confidential information which Employee obtained or to which Employee had access during his/her employment with Dannon. All such information is proprietary information and is not generally known to the public or recognized as standard practice.

Employee further agrees that all documents and tangible things made, received or compiled by Employee, or made available to Employee during employment, shall be delivered to Dannon immediately upon termination of employment or at any time upon the request of Dannon. Employee shall not retain copies of said documents or provide or transfer them in any way to any person, firm, corporation, enterprise or other entity.

. . .

### 3. NON-COMPETITION

During Employee's employment with Dannon, Employee will not, without the express written Consent of Dannon, engage at any time in any business or activity which competes directly or indirectly with the present or future business of Dannon or is in any other way destructive of or harmful to any business interests of Dannon. In addition, Employee agrees that, during the term of employment with Dannon, Employee will devote his/her full time and best efforts to Dannon's business and will work solely for it and will not consult, work or perform services for any other person, firm, company, entity or enterprise without written consent of Dannon.

During Employee's employment with Dannon, Employee will not, without the express consent of Dannon, directly or indirectly, by himself/herself or through any other person, firm, pm1nership, corporation, entity or enterprise: (a) solicit, entice, pay, divert, induce or otherwise deal with any employee, applicant customer or client who Employee knows or has reason to know Dannon has solicited or intends to solicit as an employee, applicant, customer or client; (b) form, join, operate or otherwise associate

or consult with a competitor of Dannon; (c) provisions (a) and (b) are not intended to and shall not be interpreted to, completely bar employee from obtaining work in Employee's chosen profession. Rather, the restraints are intended to reasonably limit Employee from engaging in conduct involving a substantial risk of the undetectable use of trade secrets or confidential information in direct competition with Dannon.

Confidentiality Agreement and Agreement Relating to the Assignment of Inventions

Employee understands and agrees that Dannon will be irreparably injured by disclosure of trade secrets and/or confidential information in breach of this Agreement. Employee further agrees that Dannon shall have the right to injunctive relief and/or specific performance of this Agreement in addition to any other rights or remedies available to it as a result of such breach. Employee further agrees to reimburse Dannon for all costs and attorney's fees incurred to enforce this Agreement.

21.     Dannon also requires that its outside agencies, consultants and brokers sign non-disclosure agreements, which prohibit those persons and entities from disclosing to third parties any trade secrets or confidential information they may have been provided during the course of their work for Dannon.

22.     Dannon has issued several employee policies that reiterate and stress each employee's obligation to keep confidential the proprietary and sensitive information provided to that employee and the employee's further obligation to limit transmission of that information unless "strictly necessary to do so."

23.     For example, Section 4.4 of the Business Conduct Policy (that Muyshondt would have been trained on) states:

Every employee ensures the protection of and compliance with the confidential nature of any information held in the work context, unless the sending of information is strictly necessary for the performance of his or her task.

By way of example, such confidential information consists of decisions, plans and budgets, non-published results, remuneration, sales forecasts, new products, industrial processes, research programmes, acquisition or

assignment projects, customer, prospecting and supplier files, commercial
contracts and agreements, etc.

24.     The Employee Conduct rules provided in Dannon's Employee Handbook stress

the importance of careful handling of confidential and proprietary material and also contain

express directives that employees must follow when handling confidential information:

**Confidential Information**

*Policy Highlights:*

During employment with Dannon, employees may receive, observe and
otherwise be exposed to non-public confidential and proprietary
information and trade secrets belonging to Dannon, its parents, subsidiaries
or affiliated companies, including without limitation, formulas, marketing
plans, production and processing data, sales volumes and estimated
volumes, marketing research data, product data, packaging data, financial
data, business relationships, business strategies and objectives,
manufacturing processes, and its distribution system ("Confidential and
Proprietary Information").  Confidential and Proprietary Information is not
known outside of the Company or even known to all of Dannon's
employees. Keeping Confidential and Proprietary Information confidential
is necessary to ensure our success. Because Confidential and Proprietary
Information has substantial value to Dannon, all employees must exercise
the highest degree of care not to disclose Confidential and Proprietary
Information belonging to Dannon, its parents, subsidiaries, or affiliated
companies (collectively referred to in this section as the "Company"), even
inadvertently in public areas, to any unauthorized persons in or outside the
Company.

    . . .

*Policy Details:*
- Employees cannot use for their own gain or disclosure, except within the
  scope of employment, any trade secrets or other Confidential and
  Proprietary Information relating to the Company.
- Employees must surrender all Confidential and Proprietary Information and
  other Company property, whether electronic or in hard copy, to the
  Company upon termination of employment or at any time upon the request
  of their manager or HR Department.
- Sometimes even the most innocent acts or requests can result in disclosure
  of Confidential and Proprietary Information.  Employees should always
  think before speaking with a third party. If an employee believes
  Confidential and Proprietary Information must be disclosed to a third party,
  they should consult with and gain approval from their manager in advance

of doing so.  Disclosure of Confidential and Proprietary Information without express consent of the appropriate level of management is unacceptable.

In order to maintain confidentiality over the Company's Confidential and Proprietary Information while traveling, you must adhere to the following guidelines:

- Use of a privacy screen for your laptop
- Do not view Company documents containing highly Confidential and Proprietary Information such as product formulas, new product launches, customer and brand sales information while in a public place such as a plane, airport or restaurant
- Keep all mobile devices secure at all times. Make sure all devices are password protected
- Never use the Company name when speaking about Company business in public places
- Report lost or stolen devices company or personally owned, to IT immediately. IT will be able to take measures to protect the information on the device. For more information, please refer to the Electronic Communication Policy.
- Use of USB devices should be limited to those that are encrypted

   Any employee who violates this Confidential Information policy may be subject to disciplinary action, up to and including termination.

25.    As required by its confidential information policy, electronic devices used by Dannon employees must be password-protected.

26.    Dannon's Employee Handbook also instructs employees on their obligation to adhere to its "Clean Desk Policy," which "protect[s] intellectual property and competitiveness" by mandating that employees ensure that confidential information is locked in a desk drawer each night, and that employees should only print documents using the "secure print" option, which requires that the employee's PIN code be entered into the printer before it prints a document.

27.    Dannon enforces its policies protecting its confidential information and trade secrets.  Among other things, Dannon conducts random, periodic sweeps of the work area to verify that employees are adhering to its "Clean Desk Policy."

28.     Dannon also conducts company-wide compliance training with its employees, including regarding how to protect company information.

29.     In 2017, for example, Dannon offered a training course on that subject named "Information Security – 2017."  That course described Dannon's confidential information policy, including the types of information that may constitute Dannon's confidential information and trade secrets.  It also warned employees that, "if you ever leave our company to work somewhere else, you may not remove, disclose or use our confidential information in any fashion."  At the conclusion of the course, the test-taker must certify that he or she has "read, acknowledged, and will adhere to" the company's information security policies.

30.     Although Muyshondt did not take the 2017 training in Information Security, he took an earlier version in 2015 that contained similar information regarding the protection of Dannon's confidential information.

**MUYSHONDT'S MISAPPROPRIATION**

31.     Upon information and belief, beginning in or about August 2017 and continuing until only days before his resignation from Dannon, Muyshondt started to prepare for employment elsewhere by: (a) forwarding to his personal account information about highly sensitive financial and business plans concerning its future competitiveness, which are trade secrets; (b) downloading thousands of electronic files containing Dannon's trade secrets and confidential information and containing salary information for Dannon sales employees onto USB devices; (c) removing the SIM card from his company-issued mobile phone and substituting a new SIM card without notice to Dannon and without the company's authorization; and (d) forwarding to his personal account non-compete agreements for certain sales employees and an email contact list for every Dannon employee connected with the sales teams Muyshondt

supervised.  Muyshondt also appears to have engaged in a massive effort to delete documents from his Dannon work computer.

32.    Upon information and belief, on August 2, 2017, Muyshondt attended a seminar where Chobani's COO was speaking.

33.    On August 14, 2017, just two weeks later, Muyshondt forwarded his resume from his Dannon email account to a personal email account.  At the same time, he copied to his personal email account a sensitive business review document he had prepared in the course of his Dannon duties.

34.    On August 26, 2017, Muyshondt forwarded copies of his non-compete agreement and the non-compete agreements for several of his sales colleagues to his personal email account.

35.    Muyshondt had no duties or other job-related functions that would require him to have any need of non-compete agreements applying to his co-workers, nor to forward copies of those agreements to a personal email account.

36.    On September 28, 2017, Muyshondt forwarded to his personal email account a highly sensitive email containing Dannon's trade secrets.  In that email, which Muyshondt wrote to a few members of his sales team, he laid out Dannon's weaknesses in certain areas and the resultant effect on its competitiveness, Dannon's potential strategies for rectifying weakness, and its current and future plans for certain products.

37.    On November 27, 2017, Muyshondt forwarded to his personal email account another highly sensitive email containing confidential information about the level of Dannon's spending on its advertising and promotional efforts.

38.    On December 20 and 21, 2017, Muyshondt downloaded nearly 2,000 electronic files to an external USB hard drive.  Although a relative handful of those documents appear to

have been personal documents, such as copies of his resume, the vast majority of the documents contained Dannon's trade secrets and confidential information.

39.     The Dannon files that Muyshondt downloaded included the East Division's sales team's "merch calendars" for yogurt products in 2017 and 2018.  Merch calendars are Dannon planning documents containing trade secrets and confidential information regarding scheduled pricing promotions and other sales strategies for certain products.  Essentially, these calendars are roadmaps of Dannon's sales strategies for yogurt sales.  The information in these documents is highly sensitive and confidential in part because a competitor, such as Muyshondt's new employer, Chobani, could use the information to time its own promotions and other sales activity to go into effect just before Dannon's planned dates, reaping substantial revenues while simultaneously diminishing Dannon's revenues.

40.     The trade secret and confidential information that Muyshondt downloaded also included: analyses of Dannon's business relationships with specific customers (some of whom were not customers that Muyshondt dealt with in his job); trade rates information regarding pricing given to customers; Dannon's sales targets; and documentation about Dannon's research and development projects, including regarding its yogurt products.

41.     In addition, Muyshondt downloaded a PowerPoint presentation that included data about competition between Dannon and Chobani that was compiled at great expense to Dannon.

42.     Muyshondt also downloaded in December 2017 files containing compensation information for numerous colleagues of his on the Dannon sales teams.

43.     Muyshondt had no sales duties that would require him to have copies of these files.  The only useful function those files could serve is to provide Muyshondt with information about the salaries and other compensation earned by his colleagues that he could use to lure those colleagues to leave Dannon and work for his new employer.

44.     Upon information and belief, at the time Muyshondt downloaded these files he either already had accepted the offer of employment from Chobani or was on the verge of being made such an offer.

45.     Upon information and belief, Muyshondt forwarded to his personal email account and downloaded Dannon's trade secrets and other confidential information with the intention of retaining them after termination and disclosing them to Chobani, Dannon's direct competitor, or any other competitor at which he became employed.

46.     Dannon did not discover this downloading until after it conducted an exit interview with Muyshondt.

47.     During the interview, Muyshondt was specifically asked whether he had taken any Dannon information or still possessed any devices containing Dannon information.

48.     Muyshondt stated that he did not have any Dannon information, he did not have any USB devices with Dannon information, and he did not have any hard drives with Dannon information.

49.     Muyshondt did admit to possessing his company-issued iPhone, which he agreed to return after the interview, as he did not have it with him.

50.     About an hour after the interview, Muyshondt returned to the office where he was interviewed to return his phone—and also delivered an external USB hard drive, which he admitted contained Dannon information.   However, Muyshondt denied possessing any other USB devices containing Dannon information.

51.     Upon examination of the hard drive thereafter, Dannon discovered Muyshondt's downloading activity.

52.     Upon information and belief, Muyshondt transferred the downloaded files from the external hard drive to another device before returning the hard drive to Dannon.

53.     A forensic examination of Muyshondt's work computer also has revealed that since August 2017 Muyshondt plugged in as many as 14 other USB devices into the computer, which clearly were also used to download Dannon's files.  Muyshondt was not permitted to use personal USB devices in his Dannon computer, so any USB devices that he plugged into his computer since August 2017 presumptively belonged to Dannon.

54.     Muyshondt has not given any of these other USB devices to Dannon.

55.     When Dannon examined Muyshondt's company-issued iPhone after he returned it, Dannon discovered that the SIM card which had been inserted in the iPhone provided to Muyshondt had been removed, by Muyshondt, upon information and belief, and a new SIM card inserted in its place.

56.     SIM cards are used by mobile phones such as the iPhone to carry certain information.  Most notably, that information may include phone book contact information.  Thus, the SIM card that Muyshondt took may have contained phone book contact information for members of his sales teams, other Dannon employees, and potentially also Dannon's customers and others with whom a sales person at Muyshondt's level regularly interacts.

57.     On Friday, January 12, 2018, Muyshondt had his executive administrator provide him with an email contact list for every Dannon employee connected with the East Division and Kroger sales teams he managed.  Muyshondt told the administrator that he was asking for that information so that he could "have them on my phone available."  He also specifically requested the full email addresses that would be required to contact the individuals from an email system *outside* of Dannon, apparently because he was planning to contact some or all of the individuals after he left the Company.

58.     That same day, January 12, Muyshondt received a substantial six-figure bonus payment.  Muyshondt had been told previously that he would receive his bonus payment that day.

59.     The next business day, Tuesday, January 16, 2018, Muyshondt submitted his resignation to Dannon.

60.     In addition to the materials that Muyshondt has taken with him, he also deleted large numbers of files from his work laptop before returning it to Dannon.

61.     Dannon's forensic examination of the laptop remains underway, but its preliminary analysis indicates that a significant number of the deletions were of Dannon business documents for which there was no reasonable need to delete them, as they and the laptop were all Dannon's property.  Dannon has not yet been able to determine whether Muyshondt destroyed unique files, *i.e.*, Dannon's only copy of files, but based on his other actions before resigning it believes it will discover that Muyshondt in fact did so, presumably in an effort to damage Dannon.

### COUNT I
### MISAPPROPRIATION OF TRADE SECRETS IN
### VIOLATION OF DEFEND TADE SECRETS ACT

62.     Dannon restates and reavers each and every allegation contained in the preceding paragraphs herein, and the acts of Muyshondt asserted therein, as if fully recited in this paragraph.

63.     This claim is for misappropriation of a trade secret in violation of the Defend Trade Secrets Act, 18 U.S.C. §§ 1836 et seq.

64.     Dannon possesses valuable trade secrets and confidential information, whose economic value in part derives from not being generally known to, and not being readily

ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information, such as Dannon's competitors in the yogurt business.

65.     The information that Muyshondt forwarded to his personal email account and downloaded onto USB devices contained Dannon trade secrets, including information about Dannon's long term and short term business strategies, future product plans and launches, innovations, sales strategies, market trends, customer lists, customer and other third party contacts, and evaluations of its strengths and weaknesses and the strengths and weaknesses of its competitors.

66.     The trade secrets information that Muyshondt forwarded to his personal email account and downloaded onto USB devices are related to products and services of Dannon that are used in or intended for use in interstate or foreign commerce.  Dannon has nationwide operations and Muyshondt's sales teams in particular operated in multiple states on the Eastern Seaboard, including New York, Florida, and Massachusetts, and in the numerous states where Kroger, a major U.S. supermarket company, operates stores, including in Ohio.

67.     The trade secrets information that Muyshondt forwarded to his personal email account and downloaded onto USB devices was developed by Dannon through substantial effort and the information contained therein was kept in confidence by Dannon.  That information is not readily ascertainable by anyone not employed at Dannon.

68.     The trade secrets information that Muyshondt forwarded to his personal email account and downloaded onto USB devices derives independent economic value from not being generally known to Dannon's competitors (such as Chobani) and such information is not readily ascertainable through proper means by another person who can obtain economic value from the disclosure or use of the information.

69.     Dannon has taken took great efforts to keep such information confidential including by requiring the confidentiality of such information in agreements, requiring the confidentiality of such information as explained in employee handbooks and other policies, by password protecting electronic devices, and in other manners.

70.     Dannon also provides trade secrets to employees only as strictly necessary.

71.     The trade secrets information that Muyshondt forwarded to his personal email account and downloaded onto USB devices constitutes trade secrets under New York law as well as under the Defend Trade Secrets Act.

72.     At the time that Muyshondt forwarded trade secrets information to his personal email account and downloaded trade secrets information onto USB devices, Muyshondt had knowledge of the secret nature of Dannon's trade secrets under circumstances that give rise to a duty to maintain their secrecy and limit their use.  He also knew that the information is highly valuable, unique, and considered to be trade secrets.

73.     He knew this because it was obvious, because of his high-level position on Dannon sales teams, because of Dannon's workplace policies regarding the handling of confidential information, and because of his agreement with Dannon not to disseminate or disclose trade secrets and other confidential information or to retain such materials after the termination of his employment.

74.     Upon information and belief, Muyshondt forwarded to his personal email account and downloaded Dannon's trade secrets and other confidential information with the intention of retaining them after termination and disclosing them to Chobani, Dannon's direct competitor, or to any other competitor at which he became employed.

75.     Upon information and belief, Muyshondt intends to deliver, or already has delivered Dannon's trade secrets to his new employer, and Dannon's direct competitor, Chobani.

76.     Muyshondt therefore has misappropriated Dannon's trade secrets as prohibited by the Defend Trade Secrets Act.

77.     Under the circumstances, Muyshondt's misappropriation of Dannon's trade secrets has been willful and malicious, designed to aid its direct competitor.

78.     As a direct and proximate result of Muyshondt's misappropriation of Dannon's trade secrets, Dannon has suffered and will continue to suffer irreparable harm and loss, and Dannon will continue to suffer such damages unless Muyshondt is enjoined and restrained by the court.

## COUNT II

## MISAPPROPRIATION OF CONFIDENTIAL INFORMATION — NEW YORK LAW

79.     Dannon restates and reavers each and every allegation contained in the preceding paragraphs herein, and the acts of Muyshondt asserted therein, as if fully recited in this paragraph.

80.     Dannon has attempted to prevent disclosure of its confidential and proprietary information.

81.     Nevertheless, Muyshondt has knowingly and willfully misappropriated, and, upon information and belief, is exploiting for his own economic advantage and potentially the economic advantage of Chobani, a direct competitor of Dannon, confidential and proprietary information of Dannon, including, but not limited to, confidential business strategies, product information, and information concerning its market strengths and weaknesses, to which Muyshondt gained access solely through his position as Senior Vice President of Dannon.

82.     In addition to having misappropriated Dannon's confidential and proprietary information for his own advantage, it is inevitable that he will disclose the misappropriated

information to Chobani, his new employer.  It would be virtually impossible for Muyshondt to occupy a high-level sales position at a direct competitor of Dannon without relying on the confidential and proprietary information he gained while employed in the same capacity by Dannon.

83.     As a direct result of Muyshondt's wrongdoing, Dannon has been damaged in an amount to be determined at trial.

84.     Muyshondt's actions were committed knowingly, willfully and in conscious disregard of Dannon's rights.  Accordingly, Dannon is entitled to recover punitive damages in an amount to be determined at trial.

**COUNT III**
**BREACH OF CONFIDENTIALITY AGREEMENT**

85.     Dannon restates and reavers each and every allegation contained in the preceding paragraphs herein, and the acts of Muyshondt asserted therein, as if fully recited in this paragraph.

86.     Before Muyshondt began employment with Dannon, he signed the Confidentiality Agreement and Agreement relating to the Assignment of Inventions (the "Agreement"), in which, among other things, he agreed to "deliver[] to Dannon immediately upon termination of employment" "all documents and tangible things made, received or compiled by Employee, or made available to Employee during employment," and that after termination he "shall not retain copies of said documents or provide or transfer them in any way to any person, firm, corporation, enterprise or other entity."

87.     Dannon has fully complied with and performed all of its obligations under the Agreement and Amendment.

88.     All conditions required by the Agreement for Muyshondt's performance have occurred.

89.     Muyshondt's obligations under the Agreement are not overly broad, nor are they the result of duress or coercion.

90.     To the extent Muyshondt's obligations under the Agreement are deemed to be overly broad, Dannon is entitled to "blue penciling" of the Agreement to preserve Muyshondt's essential obligations not to retain or disclose Dannon's trade secrets and other confidential information.

91.     As set forth above, Muyshondt has breached the Agreement by: retaining trade secrets and confidential information; not delivering those materials to Dannon when he terminated his employment; and, upon information and belief, providing those materials to third parties.

92.     Muyshondt has also breached the Agreement by retaining confidential information concerning the compensation paid to sales colleagues and by retaining copies of non-compete agreements covering some of those colleagues.  Muyshondt's obvious intent in retaining this information is to use it to lure his now-former sales colleagues away from Dannon to join his new employer, Chobani.

93.     The full extent of Muyshondt's breach of the Agreement is not known to Dannon at this time.  Discovery is necessary to unveil the degree to which Muyshondt has retained and/or disclosed Dannon's confidential information, trade secrets, and other materials, including the SIM card from his company-issued phone.

94.     As a direct and proximate result of Muyshondt's breach of the Agreement of Dannon's trade secrets, Dannon has suffered and will continue to suffer irreparable harm and

loss, and Dannon will continue to suffer such damages unless Muyshondt is enjoined and restrained by the court.

95.     Under the Agreement, Muyshondt has already consented to injunctive relief against him regarding his breach.

96.     Muyshondt also has agreed that Dannon is entitled to recover the attorney's fees and other costs it incurs in enforcing the Agreement.

**COUNT IV**
**CONVERSION**

97.     Dannon restates and reavers each and every allegation contained in the preceding paragraphs herein, and the acts of Muyshondt asserted therein, as if fully recited in this paragraph.

98.     Muyshondt is in wrongful possession of Dannon's confidential and proprietary information.

99.     Muyshondt is also in wrongful possession of a SIM card belonging to Dannon.

100.     Upon information and belief, Muyshondt is also in wrongful possession of USB devices belonging to Dannon.

101.     Muyshondt has wrongfully asserted dominion or control over Dannon's confidential and proprietary information in a manner inconsistent with Dannon's ownership and entitlement to such information.

102.     Muyshondt has wrongfully asserted dominion or control over Dannon's SIM card in a manner inconsistent with Dannon's ownership of that card.

103.     Muyshondt has wrongfully asserted dominion or control over Dannon's USB devices in a manner inconsistent with Dannon's ownership of that card.

104.    As a direct and proximate result of Muyshondt's conversion of Dannon's confidential and proprietary information, including trade secrets, Muyshondt's conversion of Dannon's SIM card, and Muyshondt's conversion of Dannon's USB devices, Dannon has suffered direct financial and other business injury, and Dannon will continue to suffer such damages unless Muyshondt is enjoined and restrained by the Court.

### COUNT V
### BREACH OF THE DUTY OF LOYALTY/FAITHLESS SERVANT

105.    Dannon restates and reavers each and every allegation contained in the preceding paragraphs herein, and the acts of Muyshondt asserted therein, as if fully recited in this paragraph.

106.    During Muyshondt's employment, he owed certain duties to Dannon, including, but not limited to, the duties of loyalty and fidelity.

107.    By virtue of such duties, Muyshondt was prohibited from acting in a disloyal manner and was required at all times to act in accordance with the best interests of Dannon.

108.    By reason of the conduct set forth above, Muyshondt violated and breached his duties of loyalty and fidelity to Dannon, including by, upon and information and belief, acting in the interests of Dannon's competitor while still employed at Dannon.

109.    Muyshondt's breach of his duties of loyalty and fidelity to Dannon renders him a "faithless servant" within the meaning of the law.

110.    During his employment. Muyshondt received compensation, and other things of value, from Dannon at times when he was in violation of his duties of loyalty and fidelity.

111.    That compensation included a substantial six-figure annual salary and the substantial six-figure bonus payment Muyshondt received on January 12, 2018.

112.   Muyshondt's actions were extreme and outrageous and have been undertaken maliciously, deliberately and with the willful intent to cause harm to Dannon and to benefit Muyshondt.

113.   As a result of Muyshondt's actions, Dannon has lost control of its confidential information and trade secrets, causing substantial and irreparable damage to Dannon.

114.   Dannon has suffered actual injury as a direct, foreseeable and proximate result of Muyshondt's breaches of his duties of loyalty and fidelity.

115.   By reason of the foregoing, Dannon is entitled to recover compensatory damages and punitive damages for Muyshondt's breach of his duties of loyalty and fidelity, and disgorgement of monies paid to Muyshondt during his period of disloyalty, in an amount to be determined at trial.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, Dannon hereby demands a trial by a Jury on all issues triable by right of Jury.

**WHEREFORE**, Plaintiff Dannon prays:

1.   That the Court enter Judgment on Dannon's First Count that Muyshondt misappropriated Dannon's trade secrets and violated the Defend Trade Secrets Act;

2.   That Dannon be awarded damages for Muyshondt's misappropriation of Dannon's trade secrets, including damages for actual loss, in an amount to be determined at trial;

3.   That the Court enter Judgment on Dannon's Second Count that Muyshondt misappropriated Dannon's confidential information and/or trade secrets;

4.      That Dannon be awarded damages for Muyshondt's misappropriation of Dannon's confidential information and/or trade secrets, including damages for actual loss, in an amount to be determined at trial;

5.      That the Court enter Judgment on Dannon's Third Count that Muyshondt breached his contractual obligations to Dannon pursuant to the Agreement;

6.      That Dannon be awarded damages for Muyshondt's breaches of the Agreement, in an amount to be determined at trial;

7.      That the Court enter Judgment on Dannon's Fourth Count that Muyshondt converted Dannon's confidential information and/or trade secrets;

8.      That Dannon be awarded damages for Muyshondt's conversion of Dannon's confidential information and/or trade secrets, in an amount to be determined at trial;

9.      That the Court enter Judgment on Dannon's Fifth Count that Muyshondt breached his duties of loyalty and fidelity to Dannon;

10.     That Muyshondt be held to be a "faithless servant" and be compelled to disgorge all sums paid to him during the period of his disloyalty;

11.     That Dannon be awarded appropriate punitive and/or exemplary damages for Muyshondt's misappropriation of Dannon's confidential information and/or trade secrets and his breaches of the duties of loyalty and fidelity, in an amount to be determined at trial;

12.     That Muyshondt be enjoined from using or disclosing Dannon's confidential information and trade secrets, other than as expressly permitted by Dannon;

13.     That Muyshondt be enjoined to return all physical property, confidential information, and trade secrets belonging to Dannon that are in his possession, custody and control;

14.     That Muyshondt be compelled to account for any disclosure he has made of Dannon's confidential information or trade secrets;

15.     That Dannon be awarded its costs and reasonable attorney's fees to the extent permitted by law and the Agreement; and

16.     That the Court should enter such other and further relief as this Court deems just and equitable.

Dated:    New York, New York
          February 21, 2018

TARTER KRINSKY & DROGIN LLP

By: _____
        Richard C. Schoenstein
        Joel H, Rosner
        1350 Broadway, 11th Floor
        New York, New York 10018
        Tel: (212) 216-8000
        Fax: (212) 216-8001
        rschoenstein@tarterkrinsky.com
        jrosner@tarterkrinsky.com

        *Attorneys for Plaintiff*
        *The Dannon Company, LLC*